Good morning. Good morning, Honorable Judges. Eduardo Zamanal appearing on behalf of the petitioners. We ask you to speak up just a little bit. Just raise the level of your voice a little bit. Yes, Your Honor. Do you have teenagers at home? Pardon me, Your Honor? Do you have teenagers at home? Yes, Your Honor. Act like you're talking to them. Unfortunately, a couple of months ago, I lost my voice. Oh, I'm sorry to hear that. Raise it as much as you can. I will try my very best, Your Honor. Just as the previous case, this case involves a lady who fell in love with a local American citizen. The petitioner is an ethnic Filipina who later on became a Canadian citizen. He was admitted to the country as a B2 non-immigrant visitor. And while on her second sojourn in Honolulu, she met a local male and fell in love with. Eventually, they had a relationship. They decided to get married. And unfortunately, not long, like seven months after they got married, disaster struck their common lives when the local American citizen male made a self-inflicted wound and died as a result of it. But during the seven months that they were married, they lived together in at least two places here in Honolulu. Now, three weeks after they got married, the couple went to the then Immigration and Naturalization Service and submitted a visa petition as well as adjustment of status papers. The Immigration and Naturalization Service, which I will call briefly as INS, proceeded to process the papers, had the couple interviewed, and the visa petition was approved. The lady was given the status of a conditional permanent resident. Do I understand correctly that when the couple got married, the mother of the husband's children was present at the ceremony? No, none. That's not accurate, Your Honor. What was revealed was that the girlfriend... She was. She was the girlfriend. Was she a witness to the ceremony? And she was a witness to the ceremony, right? It turned out, yes, Your Honor. And she was the mother of his children. Yes, that's correct, Your Honor. Okay. But at that moment, the petitioner was not even aware of that. Whether or not the husband intentionally did it, the petitioner was not entirely aware of this. Not until after they got married. Okay. Go ahead. In any case, Your Honor, the... When... Within the time period specified by the law, the petitioner had submitted her application for waiver insofar as her conditional resident status is concerned. And this petition was processed, the petitioner was interviewed, and unfortunately for her, INS found that she was not deserving of the petition. Now, six... Now, I guess the... With the case which the immigration judge, the judge found for the government and ruled that the marriage was entered into not in good faith and just to procure her admission into the United States. And again, unfortunately for the petitioner, the Board of Immigration Appeals sided with the government. Now, the main issue in this opinion, Your Honor, concerns the matter of whether or not the standard being adhered to or followed by this court which is substantial evidence had been complied with insofar as the government is concerned because under the Immigration and Nationality Act, it was... The Board of Approval was on the government to prove that the allegations, the information, the facts stated in the petition are not true. And it is our submission, Your Honor, that the government failed to do this. In particular, the judgment of the immigration judge relied so much on so many conjectures and inferences. The evidence submitted, and this included the government witness as well as one of the witnesses whom the judge characterized as the most expressive and credible, did testify. It came upon me that the petitioner and the late husband had lived together no matter how brief because, again, unfortunately for the petitioner, the relation didn't last that long, so much so that they were not even able to acquire substantial assets between themselves. And also, this was confirmed by the government witness who said that during the interview with the late husband and the petitioner during their first interview that they did live together and as a matter of fact, they were at least able to submit three pieces of evidence which are, number one, a lease agreement which to us shows that they had lived together as husband and wife under the same roof, Your Honor. Well, the lease agreement was suspect though. Basically, it was a room in an apartment of the relative with no dates filled in and the immigration judge found that that was hardly the kind of lease one might submit because it was of questionable origin. Well, what you said, Judge, is true. But if this is viewed in the light of the testimony given by a petitioner, the court would understand that at the time that they barely had jobs, that they were basically just helping out in the payment of a minimal amount to pay for the room that they were allowed to use. But eventually, I guess aware that they may have to come up with a proof that they did really live together, so they had to be kind about it. They had to prepare something since they were living in a house of their own, Your Honor. It's kind of not too encouraging though. It's sort of like back signing a document, you know, sort of creating the lease as evidence when it really wasn't evidence at the beginning, all of which I think gave the immigration judge some flaws about credibility. So it just seems that it would be hard to say that the immigration judge somehow was mistaken in making the analysis of the lease unless there's something else we should look to, or testimony or any other testimony we should look to. Aside from this, Your Honor, the petitioner was able to submit a First Hawaiian Bank account, which was in the name of both the late husband and the petitioner. I know that the balance at that time was quite minimal, $670, but that's all they could save given the fact that she was merely a helper at 7-Eleven and she was trying to save as much money as she could. Additionally, Your Honor, she was able to procure a life insurance policy, naming the late husband as the beneficiary. Again, one could say that the amount for his value of $25,000 is quite small, but given the fact that, again, she was just earning the minimum wage to her that was large enough. And on the record, Your Honor, she was able to establish also that, contrary to what was testified by the government witness, there was even a David Exchange wedding rings, although it must be stated that, indeed, there were no photographs taken during the ceremony, because this was before Judge Manoia in the family court of Honolulu. Okay. Well, you've used up your time for argument. Thank you very much for your argument. Thank you very much, Your Honor. Would you like to sign? Please, the court. Barry Pendenhall, appearing on behalf of the Attorney General, Alberto Gonzalez. In this case, the government only had the burden of proof by mere preponderance of the evidence. And this Court's reviewing to see whether the government met its burden by preponderance for substantial evidence. And the reason the Court's reviewing under the substantial evidence standard is because the determination of whether it was a qualifying marriage is a factual determination, which this Court reviews for substantial evidence. I think when you look at the evidence in the record, both the documentary evidence and the testimonial evidence, one can only believe that this was not a bona fide marriage. And in reviewing this, the Court has to keep in mind that in order to overturn an immigration judge's determination here, the record evidence would have to compel a contrary conclusion to what the immigration judge found. Turning to the documentary evidence, as Judge McKeon was just speaking about, the rental agreement, it merely lists the petitioner and Alexander as tenants at an unspecified address. It was signed on December 1st, 1992. Notwithstanding that they moved in there right after their wedding in August, so it's essentially four months after their wedding, and it doesn't list the address and it doesn't list the terms or the conditions of the contract, supposed contract between the petitioner, Alexander, and her cousin, Kane. The settlements account, one more thing about the rental agreement. The immigration judge has found that her testimony, Hill's testimony about the rental agreement was not exactly candid because it was evolving and it changed. And the final answer that Ms. Hill gave to the immigration judge regarding the rental agreement was that, in fact, it had been prepared for the purposes of her immigration papers. In other words, it looks like she's trying to create a paper trail. The savings account, as that was the other document, one of the other documents, and essentially it merely establishes that on October 2nd, 1992, two months after the wedding, that they, in fact, had a joint bank account having close to $700 in it. It doesn't, as the immigration judge found, easily establish that there was a commingling of funds. It just looks like perhaps Ms. Hill put his name on the account and that he wasn't making any contributions or commingling his funds with her funds. That's all that the savings account shows. The third piece of documentary evidence was the insurance policy. It's important to note that it wasn't even created until November of 1992, some three months after the marriage. And at the time that it actually was initially taken out, Ms. Hill put on, as the beneficiary of that insurance policy, her father back in the Philippines. It wasn't until February of 1993, one month before Alexander committed suicide, that he, in fact, was eventually put on as the beneficiary on the insurance policy. Is there any evidence in the record as to whether she was able to collect on that or was there a suicide exclusion? I don't know what happened, Your Honor, in terms of collecting on the insurance policy. The question I was about to make preceded by this comment, if you'll allow me. Whatever standard we use to look at the work of immigration judges, the bottom of it is the notion that a fair-minded, neutral magistrate made these determinations. And in a case where an immigration judge says to a petitioner, why don't you go back where you came from, it hardly helps us have that kind of confidence. Your Honor, I think that discussion came up at the beginning of the hearing about whether she was interested in taking voluntary departure. And I think that was sort of the context. The immigration judge says, why don't you just go back to Canada? Oh, as an option. Because she was a Canadian immigrant. In light of the fact that this petitioner had been from Mexico, would we look at it differently? Well, I think what it was was that she once had immigrated from the Philippines to Canada, and she'd only been here a very short period of time, entered this marriage. The husband committed suicide. That was no longer in the picture. And so the immigration judge was just expressing a concern about perhaps she might want to go to Canada. It might not have been the most appropriate sentence. Perhaps she might want to go to Canada. I'm quoting what she said. Why don't you just go back to Canada? And that suggests to me, along with some of the comments that were made on the record in the last case, because it's the same immigration judge, right? It is, Your Honor. Who, as I understand it, thankfully doesn't work for the service anymore. I don't know if she does or not. I believe she's still here as an immigration judge in Honolulu. She's changed her name. She got married. Do you understand why it can have a corrosive effect on our acceptance of the neutrality and fair-mindedness of a magistrate when comments like that are made? I do, Your Honor. But if they wanted to make some sort of serious challenge, due process challenge, the immigration judge had acted inappropriate or whatnot, then they needed to exhaust that in front of the board because that's a sort of due process challenge that requires exhaustion because, in fact, if there was any misconduct by the immigration judge, the board is in the position to remedy that. In this case, they didn't make any serious challenges that the immigration judge had acted inappropriately. As a matter of fact, they just mentioned that one of the things they complained about, that there was improper inferences and conjecture, that was never raised to the board. So I don't think that issue of the judge's conduct is before this Court because it was never exhausted. Do you think it's proper for an immigration judge to make that kind of comment? Do I think it's proper? I think it may have been a little inappropriate. I think the Court needs to get past that because I think one of the things is the immigration judge was simply trying to assess her situation here in the United States. We get told all the time to respect the decisions that magistrates at the administrative level make, and it becomes more difficult to do that when we see comments like this. Yeah. Your Honor, but you have to look at the decision in this case. We're talking about a 20-page well-reasoned decision. I can assure you that we will, but someone needs to say something to Oyl or the chief immigration judge or something because this is way outside the line. It's not even, in my judgment, it's not even close to whether it's appropriate or not. It's way outside the line. Your Honor, if that's the case and they, in fact, want to put that in front of this Court, then they're required to make that discussion. I understand your jurisdictional argument, and we will certainly look at the merits. But I hope when you get back to Washington, we'll talk to somebody. Of course, Your Honor. This Court is repeatedly asking us to bring back information to Oyl, and we do. I mean, it comes up in our Thursday staff meetings. It's what this Court and other courts are asking us to bring back for moral arguments, and I can assure the Court that we repeatedly talk about what the courts are asking us to bring back. When, in fact, representatives of EOR, the Executive Office of Immigration Review, are there and present, the board members, the board representatives are at these meetings. So we do bring this stuff back. Returning back to the documentary evidence, one of the significant pieces of documentary evidence that still is in the record is the death certificate. The death certificate originally indicated that Alexander was unmarried. It was amended in December of 1995 to indicate that he was, in fact, married. But what wasn't amended on the death certificate was the fact that it still lists his address at 1365 Frank Street, which is Andrea's address at the time of his death. That was on the original death certificate, and that was on the amended death certificate. And I think the Court is already well aware that the marriage contract listed Andrea, the long-term girlfriend, as the only witness to the marriage. I mean, one of the most damaging – they brought in two witnesses to talk about the bona fides of the marriage, and Lori Areda and Kane, Jeannie Kane. And Areda's testimony, which is probably the most damaging, she indicates that her sister Andrea was Alexander's boyfriend. They had two children. Four months after the marriage with Ms. Hill, Alexander impregnates Andrea. She gives birth to the third child five months after his death. And she testifies that, yes, after he impregnated her, my sister Andrea, he continued to see her. In terms of the purpose of what she was brought there for, ultimately to testify about the bona fides of the marriage, at the end, when the immigration judge pressed her about, well, what was her opinion about the bona fides of the marriage, and basically she had to conclude, well, first she said, maybe Alexander married her for sex or out of spitefulness, but ultimately she concluded that she actually didn't know or could not answer whether the marriage was bona fide. So this is supposed to be their witnesses establishing that it was a bona fide marriage. And she doesn't corroborate that it was. And as far as her cousin, Jeannie Kane, her testimony was that none of the Kane family members attended the wedding. She actually had no knowledge whatsoever about these alleged wedding rings. She testified that Alexander didn't move anything into the apartment except a few bits of cloths and that she rarely saw Alexander at the apartment, and that she was told by Ms. Hill that frequently he did not come home. So if that was supposed to be a witness, that was supposed to confirm that he was actually living there, she absolutely failed to convince the judge of that. And I think when the Court looks at overall the record in this case, a contrary conclusion is not compelled by the record. Thank you. Thank you for your argument. Thank both sides for their argument. The case just argued will be submitted for decision.
judges: Hawkins, McKeown,clifton